UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NAVY SEAL 1, et al.,

     Plaintiffs,

v.                            CASE NO. 8:21-cv-2429-SDM-TGW

JOSEPH R. BIDEN, et al.,

     Defendants.

_____/

## **ORDER**

On August 23, 2021, the FDA licensed Pfizer's COVID-19 vaccine.  On August 24, 2021, the Department of Defense (DoD) directed each branch of the military to require "full vaccination of all members of the Armed Forces."  As a result, each branch by regulation requires "full vaccination" (that is, the final injection plus fourteen days) not later than a stated day: November 2, 2021, for the Air Force; November 22, 2021, for the Coast Guard; November 28, 2021, for the Navy and Marines; and December 15, 2021, for the Army.

Although each branch permits a service member to request a religious exemption (and other exemptions) and although each branch defers the vaccine requirement during the request and any appeals, the military's data (Doc. 34) show that the military through mid-November has received about 16,643 requests for religious exemption and denied about 2,223, which resulted in 466 appeals.  The military had finally denied only one request but had granted none, preliminarily or otherwise.

On September 9, 2021, President Biden issued Executive Order 14042, which causes federal agencies to include in any new, renewed, or modified contract a federal task force's guidance requiring the vaccination of a federal contractors' employees not "entitled to an accommodation."  Also on September 9, 2021, President Biden issued Executive Order 14043, which directs each federal agency to require the vaccination of every federal civilian employee "with exceptions only as required by law."  The executive orders and implementing guidance commit to the employing agency or contractor the discretion to resolve a religious exemption.

Harboring a religious objection to the COVID-19 vaccine, the plaintiffs sued and promptly moved to preliminarily enjoin the military directive and the executive orders.  The plaintiffs comprise service members in each branch (except the Space Force), a federal contractor, and employees of other federal contractors (but no employee of a federal agency) and sue President Biden (but no federal agency) and the Secretary of DoD and the Department of Homeland Security (but no branch of the armed forces).  The plaintiffs move to represent a putative class of all service members, all federal contractors, all employees of federal contractors, and all federal civilian employees.  The plaintiffs claim that the military directive and the executive orders violate the "informed consent" provisions of 21 U.S.C. § 360bbb-3 (Count I), the Free Exercise Clause of the First Amendment (Count II), and the Religious Freedom Restoration Act (RFRA) (Count III).  The complaint and the plaintiffs' other papers identify each plaintiff by title but not by name, and no motion to proceed pseudonymously appears.

- 2 -

## PRELIMINARY ISSUES

1.   <u>No plaintiff is a federal civilian employee</u>.

The plaintiffs sue to enjoin Executive Order 14043, which directs each federal agency to require the vaccination of the agency's federal civilian employees, but no plaintiff is a federal civilian employee.  Although the complaint identifies a plaintiff as "Department of Energy Civilian Nuclear Tech," during the hearing on the motion for a preliminary injunction counsel for the plaintiffs acknowledged that Civilian Nuclear Tech works for a federal contractor, not a federal agency.  Because no plaintiff is a federal civilian employee, the plaintiffs cannot challenge Executive Order 14043. *California v. Texas*, 141 S. Ct. 2104, 2114–16 (2021); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("[N]amed plaintiffs who represent [the] class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class[.]'")

2.   <u>Each executive order includes a religious exemption</u>.

Challenging Executive Orders 14042 and 14043 as violative of the Free Exercise Clause and RFRA (Counts II and III), the plaintiffs claim that the executive orders "prohibit[] Plaintiffs from seeking and receiving exemption and accommodation for their sincerely held religious beliefs against the COVID-19 vaccines."  (Doc. 1 ¶ 198)  But Executive Orders 14042 and 14043 expressly require religious exemption, and federal guidance commits to the employing federal contractor and to the employing federal agency, respectively, the discretion to resolve an employee's request

for a religious exemption.[1]   Further, the complaint includes no federal civilian employee, and the record remains devoid of material suggesting that any plaintiff's employer is a federal contractor "covered" by Executive Order 14043.  Finally, the complaint alleges that a contractor unlawfully denied an employee plaintiff's request for a religious exemption.  Although an employer's unlawful denial might support a claim against the employer, the denial supports no challenge to the executive orders, which commit to the employer the discretion to resolve a religious exemption.[2]

    3.    <u>No injunctive or declaratory relief can issue against the President</u>.

Although injunctive and declaratory relief can issue against a subordinate official or agency charged to implement an executive order, the plaintiffs sue President Biden but no subordinate official implementing Executive Orders 14042 or 14043. "With regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in

---

[1] Federal guidance commits to the employing contractor the responsibility "for considering, and dispositioning, such requests for accommodations regardless of the covered contractor employee's place of performance." Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, at 10 (Sept. 24, 2021), available at https://perma.cc/6DRV-LV2Q. And a federal agency considers "the basis for the claim; the nature of the employee's job responsibilities; and the reasonably foreseeable effects on the agency's operations, including protecting other agency employees and the public from COVID-19." Safer Federal Workforce Task Force, *FAQs, Vaccinations, Limited Exceptions to the Vaccination Requirement* (Oct. 26, 2021), available at https://perma.cc/5Q6U-4CGG.

[2] In the complaint, an owner of a federal contractor alleges confusion about the requirements of the process for granting a religious exemption. No claim in the complaint successfully accomplishes the formidable, if not impossible, task of elevating confusion to an injury that supports a claim for relief.

- 4 -

the performance of his official duties." (quotation marks omitted)). Although a statute can authorize review of a president's action, RFRA lacks an "express statement by Congress" evincing statutory authority to review the President's action under RFRA. *Franklin* at 801; *Newdow v. Bush*, 355 F. Supp. 2d 265, 280–82 (D.D.C. 2005) (applying *Franklin* to deny a preliminary injunction asserting a RFRA claim against President Bush).

      4.    <u>No private right of action exists under 21 U.S.C. § 360bbb-3</u>.

Challenging the executive orders, the civilian plaintiffs sue under the "informed consent" provisions of 21 U.S.C. § 360bbb-3(e)(1)(A), which requires the FDA to establish for an emergency product "[a]ppropriate conditions designed to ensure that individuals to whom the product is administered are informed" of "the option to accept or refuse administration of the product[.]" But this statutory "option to accept or refuse" an emergency vaccine confers no private right of action, creates no "'opportunity to sue the government[,]'" and permits enforcement by the United States and by the states in specific circumstances only. *Doe v. Franklin Square Union Free Sch. Dst.*, 2021 WL 4957893, at *20 (E.D.N.Y. 2021) (citing *Bridges v. Houston Methodist Hosp.*, --- F. Supp. 3d --- 2021 WL 2399994, at *2 (S.D. Tex. 2021)).

      5.    <u>No service member can likely prevail under 10 U.S.C. § 1107a</u>.

Challenging the injection of a vaccine that (according to the plaintiffs) the FDA has authorized for emergency use only, the service-member plaintiffs sue the

DoD under 10 U.S.C. § 1107a,[3] which, the defendants apparently concede, prohibits the military's administering an emergency vaccine without the service member's consent. Although the FDA licensed Pfizer's vaccine as "safe and effective," the plaintiffs argue that the licensed vaccine, which the FDA license permits Pfizer to market as "Comirnaty," remains unavailable in the United States. The service-member plaintiffs contend that the vaccination deadline compels their accepting without consent the injection of an emergency vaccine.

Pfizer has produced vaccines bearing the "emergency use authorization" label but nonetheless complying with the technical, scientific, compositional, manufacturing, and other requirements of the FDA license. (Doc. 23-14 ¶ 13) Comirnaty comprises "the same formulation as" Pfizer's emergency vaccine and "can be used interchangeably . . . to provide [the two-dose] vaccination series[.]" (Doc. 23-14 at 33) The plaintiffs identify no factual distinction between Pfizer's vaccine bearing the emergency label but produced in compliance with the FDA license and Pfizer's "interchangeable" vaccine bearing the Comirnaty label. Also, the plaintiffs identify no legal distinction pertinent to informed consent under 10 U.S.C. § 1107a. The August 24, 2021 DoD memorandum states that "[m]andatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure" and that the DoD possesses and "is using" "hundreds of thousands" of Pfizer vaccines bearing

_____

[3] In the complaint, the plaintiffs fail to cite 10 U.S.C. § 1107a and instead cite 21 U.S.C. § 360bbb-3, which includes no private right of action. A review of the motion for preliminary injunction suggests that the service-member plaintiffs intend to sue under 10 U.S.C. § 1107a.

the emergency label but complying with the FDA license.  (Doc. 23-15 ¶ 18)  Nothing in the record suggests that a service-member plaintiff, each of whom remains temporarily exempt from the military's vaccination requirement during the pendency of a request for religious exemption and during any appeal, requested or was denied a Pfizer vaccine complying with the FDA license.  The plaintiffs fail to show that the military will require — imminently or otherwise — a service-member plaintiff to receive an emergency vaccine not complying with the FDA license.  *Doe v. Austin*, No. 3:21-cv-1211, Doc. 47 (N.D. Fla. Nov. 11, 2021) (Winsor, J.) (denying a preliminary injunction "[b]ecause the [service-member] plaintiffs have not shown they are (or will be) required to receive an EUA-labeled, non [license]-compliant vaccine[.]")

*       *       *

Because no plaintiff is a federal civilian employee, because each executive order includes a religious exemption, because no injunctive or declaratory relief can issue against the President, because no private right of action exists under 21 U.S.C. § 360bbb-3, and because no service member can likely prevail under 10 U.S.C. § 1107a, only the service members' claims under the Free Exercise Clause and RFRA remain for discussion.

## DISCUSSION

This action questions the effect of the Free Exercise Clause, the "prohibiting" clause of the First Amendment.[4]  The meaning of the Free Exercise Clause, which understandably leaves "free exercise" undefined, has confused, confounded, and vexed studious and well-meaning citizens and, especially, beleaguered jurists for many decades.  (For a vivid example, see *McGowan v. Maryland*, 366 U.S. 420 (1961) (separate opinions appear at 366 U.S. 459, 561, 583, 599, and 617).

Thomas Jefferson in his often-remarked letter (his "wall of separation" letter) to the Danbury Baptists in 1802 seems confidently to declare that "the legitimate powers of government reach actions only, and not opinions" and that a person "has no natural rights in opposition to his social duties."  James Madison, often but not always in agreement with Jefferson, held that the constitutional meaning of "religion" extends to "the means of discharging" religious faith.  And, among others, William Penn held that "liberty of conscience," which during the time of the Founders meant religious liberty, included "not only a mere liberty of the mind, in believing or disbelieving . . . but the exercise of ourselves in a visible way of worship."  Of

---

[4] The First Amendment, a spare but dense forty-five words, preserves against legislative intrusion by Congress an array of rights irreplaceable to the civil and peaceful preservation of a constitutional republic. After the central prohibition "Congress shall make no law," the First Amendment deploys three participles to identify the laws the amendment forbids. The three participles—respective, prohibiting, and abridging—are not identical and not synonymous but suggest a hierarchical ordering. Akin to the encompassing but amorphous phrase "relating to," "respecting" connotes the proscription of any law touching the pertinent rights. A more focused and more targeted phrase, "prohibiting" connotes a bar against any law that disallows, proscribes, or precludes the pertinent rights. "Abridging" connotes a bar of any law that compacts, constricts, confines, or otherwise impedes the pertinent rights. But the Supreme Court seldom, if ever, mentions the presence of these three distinct terms and attributes little, if any, importance to the apparent hierarchy of protections embedded in the First Amendment.

course, the statements and the writings of this or that person, however prominent in the politics of the founding years or of another time, might influence — but cannot in isolation resolve — the meaning of a founding document (or any other document) that was drafted by one or more persons, first approved by a larger group of persons, and finally approved after further and more encompassing deliberation, for example, in the several states.  Although famously inconstant and sometimes even self-contradictory on the subject, the Supreme Court's interpretation governs the content and effect of the First Amendment (the Supreme Court's exclusive power to interpret the Constitution is one of the rare doctrines on which the Supreme Court is tirelessly constant).

Remarkably, from 1789 to 1878 the Supreme Court had no occasion to expound the meaning of the Free Exercise Clause (perhaps the meaning was agreed and accepted, and the lawmakers, mindful of the Constitution and the tradition of deference to religious beliefs and tolerance of religious difference, prudentially chose tolerance and diversity over aggression and enforced homogeneity).  But a territorial legislature's response to polygamy among the Mormons resulted in *Reynolds v. United States*, 98 U.S. 145 (1878), in which Chief Justice Waite for a unanimous court evaluated whether at Reynolds's trial the judge should have instructed the jury that if Reynolds, a Mormon criminally charged under the law of the Territory of Utah with bigamy, was married simultaneously to two women "in pursuance of and in conformity with what he believed at the time to be a religious duty, th[en] the verdict must be not guilty."  98 U.S. at 161.

- 9 -

*Reynolds* sounds strongly the theme that bigamy "has always been odious among the northern and western nations of Europe," in England and Wales was punishable by death, and was at all times in the states of the United States "an offence against society." Fortified by a recitation of some pertinent history, by a survey of the states, and by the force of public opinion, *Reynolds* finds that by force of the Free Exercise Clause:

> Congress was deprived of all legislative powers over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.
>
> . . .
>
> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.

98 U.S. at 145. *Reynolds* reaches a Jeffersonian result, entirely consistent with his reassurances to the Danbury Baptists, a small and uneasy assembly at the time, that "the legislative powers of the government reach action only, and not opinions."

After *Reynolds*, the Free Exercise Clause received little attention in the Supreme Court until *Cantwell v. Connecticut*, 310 U.S. 296 (1940), discovered that the Fourteenth Amendment had incorporated the Free Exercise Clause and subjected the state's law to the First Amendment's admonition that "Congress shall make no law." With the addition of challenges to state laws affecting religion, the frequency of Supreme Court decisions on the Free Exercise Clause accelerated. In *Cantwell*, three Jehovah's Witnesses were convicted of soliciting house-to-house for contributions to the church without first procuring a permit from "the secretary of the public welfare

council of the state."  Soliciting for a religious contribution in Connecticut was fine, but soliciting without a permit from the public welfare secretary was, according to Connecticut, an illegal incitement of a breach of the peace.

*Cantwell* finds that the public-welfare secretary's capacity to accomplish the "censorship of religion" by an exercise of governmental permitting discretion imposed a "prior restraint" — a "denial of liberty protected by the First Amendment" as incorporated into the Fourteenth Amendment and applied to Connecticut.  Although casually mingling concepts of freedom of religion with concepts of freedom of speech (and perhaps freedom of assembly), *Cantwell* resolves:

> [T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution.

310 U.S. at 307.

Legal developments from the fraternal disagreement between Jefferson and Madison to the present dispute are too lengthy to detail precisely.  But a distinct and troublesome thread of tension between religion and legislation appears, and the main decisions are worth briefly recalling.  For example, the availability of the Fourteenth Amendment to support a claim against a state law yielded *Sherbert v. Verner*, 374 U.S. 398 (1963), in which a Seventh-Day Adventist lost her job when she declined to work on Saturday, the Sabbath Day of her faith.  The state denied her application for unemployment compensation because she "failed without good cause . . . to accept

available suitable work," which her employer offered if she would work on Saturday, which she would not. *Sherbert*, 374 U.S. at 401.

Explicitly confirming a distinction between regulation to "compel affirmation of a repugnant belief" and "regulation of certain overt acts prompted by religious beliefs or principles," *Sherbert* addresses "whether the disqualification for benefits imposes any burden on the free exercise of appellant's religion." *Sherbert*, 374 U.S. at 402–403. Acknowledging that the disqualification required by the unemployment compensation law "derives solely from the practice of her religion" and that the law applies "pressure upon her to forego that practice," *Sherbert* equates the effect of the law to a monetary penalty for "Saturday worship" and invalidates the law as a violation of the Free Exercise Clause because the law "penalizes the free exercise of her constitutional liberties" by inducing her to avoid the penalty by violating a "cardinal principle of her religious faith." *Sherbert*, 374 U.S. at 404–06. *Sherbert* considers whether a "compelling state interest" might counterbalance the identified infringement of religious liberty and concludes:

> It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.

*Sherbert*, 374 U.S. at 406 (citing *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). *Sherbert* was a much more Madisonian result.

Similarly, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), invalidates the state's law requiring compulsory school attendance for those under sixteen. Yoder and other

Amish declined on religious grounds to send their children to school after the eighth grade.  Writing for the court, Chief Justice Burger finds the state's interest in education ("a high responsibility") is "not totally free from a balancing process when it impinges . . . the Free Exercise Clause . . . and the traditional interests of parents with respect to the religious upbringing of their children."  *Yoder*, 406 U.S. at 213–14.  After an extensive review of the provenance and practice of Amish beliefs and after finding the beliefs sincere, enduring, and elemental to the Amish faith, the Chief Justice observes that — for the Amish — limiting a child's education to the eighth grade, to "the three Rs," "is not merely a matter of personal preference, but one of deep religious conviction."  *Yoder*, 406 U.S. at 216.  As a result, the Chief Justice finds "a very real threat of undermining the Amish community and religious practice as they exist today" and concludes:

> The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs.

*Yoder*, 406 U.S. at 218.

*Yoder* balances two strong but, in Yoder's circumstance, competing and irresolvable interests — universal education and the free exercise of religion.  Because examination identified only a marginal harm to the state's interest if free exercise rights were preserved, Yoder prevailed.  *Yoder* is avowedly an example of the court's "recognizing the need for a sensible and realistic application of the Religion

Clauses." *Yoder*, 406 U.S. at 221.  The extended discussion in *Yoder* includes this summary:

> The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests.

*Yoder*, 406 U.S. at 215.  *Sherbert* and *Yoder* governed for a several years.

Somewhat similar to this dispute is *Goldman v. Weinberger*, 475 U.S. 503 (1986), in which the Air Force enforced a dress regulation that prohibited the wearing of a non-regulation attire, including a yarmulke worn by an Air Force psychologist who was an Orthodox Jew, an ordained rabbi, and a PhD in psychology; who was practicing in a clinic at March Air Force Base in California; and whose sincerely held religious belief required his wearing a yarmulke.

Although the rabbi argued for the application of *Sherbert* and *Yoder*, then-Justice Rehnquist in his opinion for the court cited the military's "specialized society separate from civilian society" and the military's "respect for duty and a discipline without counterpart in civilian life" and determined to apply a standard (unstated) "far more deferential" than for a challenge by a civilian to a similar restriction "for civilian society." *Goldman*, 475 U.S. at 506–07.  *Goldman* offers assurances that the consequences of military discipline "do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment" and that:

> [W]hen evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give

> great deference to the professional judgment of military authori-
> ties concerning the relative importance of a particular military
> interest.

*Goldman*, 475 U.S. at 507.

Remarking the claimed need for a "sense of hierarchical unity," advanced in the military "by tending to eliminate outward individual distinctions except for those of rank," Justice Rehnquist identifies regulations providing that only "authorized headgear" is worn outdoors and that, except for on-duty law enforcement and in "designated living quarters," no headgear is worn indoors. *Goldman*, 475 U.S. at 508–09. Without a lucid expression of the applicable standard of scrutiny and an explanation of how the result in *Goldman* follows reasonably from the facts of *Goldman*, the opinion leaves the reader mystified about how a mere yarmulke, worn under a regulation Air Force cap outdoors on the base and in the confines of a psychologist's consulting rooms and clinic on the base, erodes "hierarchical unity"; how the yarmulke was even noticed (except perhaps in retaliation by Goldman's litigation adversary, who filed the complaint); and how this prospective erosion of military discipline, hierarchy, or the like — not specified, not quantified, and not even exemplified — outweighed a constitutionally fundamental right guaranteed by the Free Exercise Clause. The *Goldman* dissenters complained tellingly that the military's "lack of any reasoned basis for prohibiting yarmulkes" was "striking" and that the majority seemed to forsake the more demanding inquiry featured in *Sherbert* and *Yoder*. *Goldman*, 475 U.S. at 520 (Brennan, J., dissenting).

Soon after *Goldman* came *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in which Justice Scalia, writing for the majority, determines that Oregon — without unconstitutionally contravening the Free Exercise rights of church members — can criminalize consumption of the hallucinogen peyote, although members of the Native American Church use peyote in religious rites. While surveying the precedent in which a state law of general application competes with the Free Exercise Clause, Justice Scalia first attempts to confine the precedent to instances raising "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional freedoms, such as freedom of speech and of the press," *Smith*, 494 U.S. at 881, and next attempts to confine the balance of the precedent to instances involving unemployment compensation. Further minimizing *Sherbert* and *Yoder*, Justice Scalia cites instances, including *Goldman*, that evade *Sherbert*. In a decisive dismissal of *Sherbert*, Justice Scalia mentions his view of the limitations that *Sherbert* would encounter "even if we were inclined to breathe into *Sherbert* some life beyond the unemployment compensation field." *Smith*, 494 U.S. at 884.

In precisely describing (or, at least, in trying to precisely describe) the controlling distinction, Justice Scalia in *Smith* distinguishes between (1) a circumstance in which "the state has in place a system of individual exemptions," in which case "the state may not refuse to extend that system to cases of 'religious hardship' without compelling reason" and (2) a circumstance in which a state adopts "an across-the-board criminal prohibition on a particular form of conduct." 494 U.S. at 884.

- 16 -

Justice Scalia's coda to *Smith* presents both his recognition that several states had enacted statutory exemptions from the criminal law to permit sacramental use of peyote and his reconciliation of those exemptions to *Smith*:

> Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process.
>
> . . .
>
> But to say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts. It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs.

*Smith*, 494 U.S. at 890.

A search for a general rule emerging from *Smith* reveals this paragraph, written by Justice O'Connor in a concurrence, which recapitulates *Smith*'s formal retirement of *Sherbert*:

> The Court today extracts from our long history of free exercise precedents the single categorical rule that "if prohibiting the exercise of religion . . . is . . . merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." [citation omitted] Indeed, the Court holds that where the law is a generally applicable criminal prohibition, our usual free exercise jurisprudence does not even apply. [citation omitted] To reach this sweeping result, however, the Court must not only give a strained reading of the First Amendment but must also disregard our consistent application of free exercise doctrine to cases involving generally applicable regulations that burden religious conduct.

*Smith*, 494 U.S. at 892 (O'Connor, J., concurring).

*Smith* left much uncertainty about the breadth and vigor of the Free Exercise Clause, an uncertainty fortified by an assay of the Supreme Court's decisions, to and including *Smith*, which reveals a variety of distinctions, each offering utility in the facts of a particular case and used by the Supreme Court to resolve challenges to governmental intrusion on Free Exercise: whether the governmental action affects belief or conduct; if conduct is affected, whether the conduct is active or passive; whether the governmental action affects a religious practice that is otherwise legal or otherwise illegal; whether application or enforcement of the law is mandatory, strictly or loosely guided, or discretionary; whether governmental action enforces a law that is generally applicable or aimed toward religious activity; whether the governmental action is generally applicable or permits exceptions; if exceptions are permitted, whether the exceptions are religious, secular, or both; if exceptions are permitted, whether the exceptions favor religious activity to an extent that affronts the Establishment Clause; whether the law affects a religious belief or a conviction of secular moral conscience; whether an affected belief is sincere and, if so, whether the affected belief or conviction is implausible, irrational, or bizarre (but not whether the belief is true or untrue); whether the belief or conviction amounts to principled opposition to a category of morally offensive events or is limited to ad hoc opposition to a particular event (such as the difference between opposition to all wars and opposition to a particular war); whether the law affects only the government's conduct of its own internal affairs; and whether the law affects only the right of free exercise or also

affects other constitutional rights; and sundry other distinctions from time to time deployed by the Supreme Court "as meet and convenient."

Perceiving unhappily the result in *Smith* and the shifting grounds for the Supreme Court's other Free Exercise Clause decisions, Congress enacted RFRA, which emphatically rejects *Smith* and explicitly restores *Sherbert* and *Yoder*.  For a unanimous court in *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006), the Chief Justice confirms the congressional rejection of *Smith* in favor of *Sherbert* and *Yoder* and outlines more expressly the statutory purpose:

> [T]he Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, "even if the burden results from a rule of general applicability." [42 U.S.C.] § 2000bb-1(a). The only exception recognized by the statute requires the Government to satisfy the compelling interest test— to "demonstrat[e] that application of the burden to the person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." [42 U.S.C.] § 2000bb-1(b). A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." [42 U.S.C] § 2000bb-1(c).

*O Centro*, 546 U.S. at 424.

Further, the Chief Justice in his unanimous opinion details that, assuming a plaintiff presents prima facie evidence of a substantial burden on a sincerely held religious exercise, the government bears the burden to prove that the law in question furthers a compelling governmental interest by the least restrictive means available. Confirming the reasoning in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004), and summarizing, the Chief Justice explains:

> RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.

*O Centro*, 546 U.S. at 430.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), conceives RFRA's statutory protection for religious liberty as more comprehensive and more accessible than the constitutional protection, at least if the federal government is the alleged infringer.  Specifically, *Hobby Lobby* confirms that "RFRA did more than merely restore the balancing test used in the *Sherbert* line of cases; it provided even broader protection for religious liberty than was available under those decisions."  *Hobby Lobby*, 573 U.S. at 695 n.3; *Holt v. Hobbs*, 574 U.S. 352, 859–60 (2015) (finding that RFRA "provide[s] greater protection for religious exercise than is available under the First Amendment.")

The service-member plaintiffs in Count II challenge the military's vaccination requirement under the First Amendment and in Count III challenge the military's vaccination requirement under RFRA.  Because to a service member RFRA "provides greater protection . . . than is available under the First Amendment," the RFRA claim demands primary consideration (after all, if a service member's RFRA claim fails, the service member's First Amendment claim necessarily fails).

1.    The Religious Freedom Restoration Act

Under 42 U.S.C. § 2000bb-1, RFRA restricts governmental action that "substantially burden[s] a person's exercise of religion[,] even if the burden results from a

rule of general applicability." Under 42 U.S.C. § 2000bb-1(b), if the action substantially burdens the exercise of religion, the government must demonstrate that the burden (1) furthers "a compelling governmental interest" and (2) represents the "least restrictive means of furthering that compelling governmental interest." Under 42 U.S.C. § 2000bb-2(1), RFRA's restriction applies to action by each "branch, department, agency, instrumentality, and official . . . of the United States," including the armed forces. In *DoD Instruction 1300.17: Religious Liberty in the Military Services* (Sept. 1, 2020), the Department of Defense incorporates RFRA's standard to guide accommodating religious practice in the military.

To trigger RFRA's strict scrutiny, a plaintiff must demonstrate that a federal action substantially burdens the plaintiff's free exercise of religion. *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015). Religious exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). This definition, which "provide[s] very broad protection for religious liberty," applies to "'the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Hobby Lobby*, 573 U.S. at 693, 710 (quoting *Smith*, 494 U.S. at 877). Judicial inquiry remains limited to the sincerity of the religious belief motivating the practice. *Hobby Lobby*, 573 U.S. at 717 n.28; *see Davila*, 777 F.3d at 1204 ("'[A court's] narrow function . . . in this context is to determine' whether the [plaintiff's conduct] reflects an honest conviction.'") (emphasis omitted).

Next, a plaintiff must demonstrate that "the [governmental action] imposes a substantial burden on the ability of the objecting parties to conduct [themselves] in

accordance with their religious beliefs." *Hobby Lobby*, 573 U.S. at 724 (emphasis omitted). The action must impose more than a mere inconvenience on the plaintiff's religious practice. *Davila*, 777 F.3d at 1205. A substantial burden exists if the challenged action "'prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief,'" *Davila*, 777 F.3d at 1205 (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014)), or if the action "'truly pressures the [plaintiff] to significantly modify his religious behavior,'" *Christian Missionary All. Found., Inc. v. Burwell*, No. 2:14-cv-580, 2015 WL 437631, at *5 (M.D. Fla. 2015) (quoting *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)).

Under 42 U.S.C. § 2000bb-1(b), if the plaintiff demonstrates that the action substantially burdens religious exercise, the government bears the burden to demonstrate that the action furthers a compelling governmental interest and is the least restrictive means to further that interest. *Hobby Lobby* requires strict scrutiny of "'the asserted harm of granting specific exemption to particular religious claimants'" and of "'the marginal interest in enforcing the challenged government action in that particular context.'" *Holt*, 574 U.S. at 363 (quoting *Hobby Lobby*, 573 U.S. 726–27). That is, the government must demonstrate a compelling interest supporting the specific denial of a specific plaintiff's exemption and the absence of an alternative for that plaintiff.

The service-member plaintiffs claim that the military's vaccination requirement fails under RFRA (both facially and as applied to the plaintiffs) because the requirement burdens each plaintiff's sincerely held religious belief and fails to satisfy

strict scrutiny.  The plaintiffs assert that each plaintiff harbors a sincere religious be-lief that forbids each plaintiffs' receiving a vaccine developed using cell lines derived from an aborted fetus (Doc. 1 ¶¶ 62–68), a belief that bars each plaintiff's receiving any of the available COVID-19 vaccines, (Doc. 1 ¶ 69).

To demonstrate a substantial burden on religious exercise, the plaintiffs argue that the exemption guidelines are a ruse disguised as a several-step process that the military employs to "exclude (at least in practice) all religious . . . exemptions."[5] (Doc. 2 at 12)  The plaintiffs contend that the actual and governing policy-in-fact — perhaps emanating from an implicit understanding common to and extending throughout each branch of the military and throughout the layers of reviewing offic-ers and boards — demands the indiscriminate and undifferentiated denial of each re-quest for a religious exemption.  Thus, the plaintiffs contend, each request for a reli-gious exemption is futile, and the inevitable denial of each request (and the conse-quent order to receive the vaccine) substantially burdens each plaintiff's free exercise of religion.  (Doc. 1 ¶ 114; Doc. 2 at 11)

Also, the plaintiffs argue (but did not plead) that each branch of the military "substantially pressures" a service member to receive the vaccine despite a pending

---

[5] The DoD Secretary's August 24, 2021 memorandum directs each branch to complete full vaccination "subject to . . . any administrative or other exemptions" (Doc. 1-4), including religious exemptions. DoDI 1300.7 directs each branch to review a request for a religious exemption "on a case-by-case basis" and to grant a religious exemption request unless no lesser restrictive means can satisfy the government's compelling interest. Each branch of the military has promulgated a detailed process by which a service member requests a religious exemption, by which a chaplain assesses the service member's sincerity, and by which the reviewing officer or board analyzes the request on an "individualized" basis.

request for a religious exemption.  (Doc. 30 at 4–5)  Although no identified service member has suffered formal discipline resulting from final denial of a religious exemption, the plaintiffs allege that the commanders of several plaintiffs have altered a plaintiff's deployment status or otherwise changed adversely the terms and conditions of a plaintiff's service in an effort to pressure the plaintiff to withdraw the request and receive the vaccine.

Finally, the plaintiffs assert that the substantial burden from both the "sham" exemption procedure and the "interim pressure" fails strict scrutiny because, the plaintiffs contend, the military advances only a negligible interest in the marginal vaccination of an almost completely vaccinated force and fail to establish that forced vaccination is the least restrictive means available to accomplish the military's compelling interest.  To support this assertion, the plaintiffs argue (1) that the defendants "allow[] unvaccinated servicemembers and civilian federal employees and contractors with medical exemption[s] to continue in their same positions," (2) that "vaccines are not preventing infections from the Delta variant," and (3) that federal employees in the Department of Veterans Affairs and outside the military are "exempt from the vaccine mandate."  (Doc. 2 at 16, 20)

In response, the defendants argue that the RFRA is not justiciable and fails on the merits.  (Doc. 23 at 13)  First, the defendants argue that no challenge to the military's vaccination requirement is justiciable, although 42 U.S.C. § 2000bb-1, titled "Judicial Relief," states, "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial

proceeding and obtain appropriate relief against a government."  First, the defendants argue that the plaintiffs fail to "raise a facial challenge to any part of the existing military policies for considering religious accommodations" and that, under *Speigner v. Alexander*, 248 F.3d 1292 (11th Cir. 2001), an as-applied challenge incident to a plaintiff's military service is not justiciable in the Eleventh Circuit (although justiciable in other circuits, including the D.C. Circuit).  (Doc. 23 at 27)  In reply, the plaintiffs argue that the verified complaint asserts both a facial and an as-applied challenge and cite the allegation that "'[t]he federal COVID-19 Vaccine Mandate, on its face and as applied, targets [the] [p]laintiffs' sincerely held religious beliefs[.]'"  (Doc. 30 at 13) (quoting Doc 1 ¶ 222)

A facial challenge under RFRA must demonstrate that government action is "impermissible in all, or at least the vast majority[,] of its intended applications." *United States v. Friday*, 525 F.3d 938, 951 (10th Cir. 2008).  The defendants appear to argue that the plaintiffs can assert a facial challenge against the regulations but not against enforcement or against application of the regulations.  Citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1992), the plaintiffs argue that a law both facially neutral and generally applicable but in effect targeting the free exercise of an identifiable religious group is subject to a facial challenge under RFRA (and the Free Exercise Clause).  But *Lukumi* is dissimilar; the law of general applicability in *Lukumi* modified in practice the behavior of only one religious group, but the vaccine requirement modifies in practice the behavior of all unvaccinated service members, a discrete minority of whom harbor a sincere religious objection.

- 25 -

However, *Friday* explains another circumstance in which the practical application of a law is subject to a facial challenge. In that action, the United States charged Friday under the Bald and Golden Eagle Protection Act after Friday, a member of the Northern Arapaho Tribe, killed a bald eagle for use in a tribal ritual. The Eagle Act allows a member of a federally-recognized tribe, such as the Northern Arapaho, to request from Fish and Wildlife Services a permit to kill an eagle for a "bona fide religious use," but the permit process remained rarely used and largely unknown, even by employees of Fish and Wildlife Services. *Friday*, 525 F.3d at 944–45.

Despite not requesting a permit to kill a bald eagle, Friday challenged the permitting process as "so maladministered as to render it futile." *Friday*, 525 F.3d at 952. The district court and the Tenth Circuit recognized this futility argument as a facial challenge under RFRA. "If [Friday's contention of futility] is so, the prohibition on eagle takings contained in the Eagle Act is effectively without exception, despite the substantial burden this would place on religious practices. . . . This argument is a form of facial challenge." *Friday*, 525 F.3d at 952. Like Friday, the service-member plaintiffs argue that a service member's request for a religious exemption from the COVID-19 vaccine requirement is futile because, despite regulations in each branch purporting to require case-by-case consideration, the regulations are subject to an undisclosed policy of "deny them all," an allegation to which the available interim data lends tentative credence. Although the vaccination requirement contains a religious exemption, the contention that the vaccine requirement is "effectively without exception" constitutes a "form of a facial challenge" under *Friday*.

- 26 -

*Speigner* purports to expand *Feres v. United States*, 340 U.S. 135 (1950), which finds non-justiciable a service member's claim for money damages against the military, and finds non-justiciable any service member's claim against the military for an injury incident to service, including a claim for injunctive relief. *Feres* rests (at least partially) on the recognition that "'the Constitution contemplated that the Legislative Branch have plenary control over rights, duties, and responsibilities in the framework of the Military Establishment.'" *United States v. Stanley*, 483 U.S. 669, 679 (1987) (quoting *Chappell v. Wallace*, 462 U.S. 296, 301 (1983)). Under *Feres*, federal courts dismiss as non-justiciable a service-member's claim, such as a claim under *Bivens* or the Federal Tort Claims Act, unless Congress explicitly extends the claim to the military. For example, *Speigner* dismisses as non-justiciable a service-member-asserted, as-applied claim for racial discrimination under 42 U.S.C. §§ 1981, 1983, and 1985.

Although *Speigner* appears to bar in the Eleventh Circuit an individual service member's typical claim for damages or injunction incident to military service, Congress by RFRA purposefully creates and narrowly targets a claim, available in the district court, for everyone in every branch of government, including the military, to enforce the fundamental right to free exercise of religion. Congress enacted RFRA explicitly to respond to *Smith* and *Goldman* and to the resulting inability of many, including those in the military service, to realize and enjoy the free exercise of religion.

RFRA applies to the "government," which is defined to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb–2(1). So, on its face, the statute plainly applies to the U.S. Army. And defendants acknowledge that Congress specifically intended RFRA to apply to the military. Hr'g Tr. at 35; see also S. Rep. No. 103–111, at 12 (1993) ("Under

> the unitary standard set forth in [RFRA], courts will review the free exercise claims of military personnel under the compelling governmental interest test."); H.R. Rep. No. 103–88 (1993) ("Pursuant to the Religious Freedom Restoration Act, the courts must review the claims of prisoners and military personnel under the compelling governmental interest test.").

*Singh v. McHugh*, 185 F. Supp. 3d 201, 217–18 (D.D.C. 2016).

Also, the plaintiffs in this action purport to represent the class of military personnel whom, the plaintiffs claim, the military intends to uniformly deprive of the right of free exercise without the bona fide determination of "compelling interest" and "least restrictive means" required by RFRA.  The plaintiffs present a single, class-wide question.  *Speigner* was not a class action, did not arise under the Free Exercise Clause, and did not arise under RFRA.

Further, *Speigner* presented an individual as-applied claim for injunction but left untouched the ability of an individual to assert a facial claim.  The present class action asserts the unusual claim that the military — despite facially benign regulations conforming to RFRA — intends to, and is, contrary to RFRA, acting in fact under a policy of across-the-board denial without the individualized determination required by RFRA.  The present class action — presenting a single issue of uniform non-compliance with RFRA, which ensures free exercise — is much nearer a facial constitutional challenge than an individual claim for damages or injunction.  RFRA exists to permit the district court to review promptly an infringement by anyone in government of the Free Exercise Clause, especially if a component of the government attempts to systematically suppress the free exercise of religion.

Finally, the defendants argue that no challenge to the military's vaccination requirement is "ripe" because no plaintiff "[has] exhausted available administrative remedies." (Doc. 23 at 14)  In response, the plaintiffs note, "Congress nowhere inserted [into RFRA] . . . any exhaustion requirement, as it did, for example, in RFRA's "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000[.]" *Singh v. Mchugh*, 168 F. Supp. 3d at 226.

Like other claims, a RFRA claim becomes ripe if the plaintiff faces an "actual or imminent" injury, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1970), which occurs if the plaintiff confronts an actual or imminent burden on religious practice. In this case, the plaintiffs insist that a RFRA claim is "ripe" immediately upon the initial denial of a request for exemption and without resort to the several available appeals.  (Again, the defendants insist, and the regulations suggest, that the applicant incurs no material adverse consequence pending the result of the final appeal; interim adverse action might effect ripeness)

In vivid contrast, the defendants' claim that to exhaust the administrative remedies a service member must undertake the several appeals available from the initial denial, must receive a final and unappealable denial, must choose either to accept injection of the vaccine or to refuse a direct order, must undergo a disciplinary proceeding for refusing the order, must exhaust the appeals from the disciplinary order, and must receive a final and unappealable order imposing discipline, which might include administrative separation or discharge from the service (the defendants' counsel at the hearing could not exclude dishonorable discharge as an available discipline

for refusing the vaccine), and presumably must hope (lest the claim become simulta-neously both ripe and moot) for a judicial stay of the imposition of the punishment or must hope that the remedy, including, if necessary, both reinstatement into the military and restoration of lost benefits, is both available and awarded.

The pertinent precedents (and a fair empathy for the conscience of the sincere religious objector) suggest that in a Free Exercise Clause claim the initial episode of denial of free exercise causes irreparable harm and satisfies the demands of "ripe-ness" without the need to endure the denial of free exercise during the protracted ex-haustion of every non-judicial remedy.  But when is free exercise actually "denied?"  If the denial immediately precludes an affirmative religious observance, such as at-tending services, praying, washing, receiving communion, or some similar overt act, the right to immediate resort to court seems clear and compelling.  In the present in-stance, the first moment an objecting service member must act contrary to a religious belief is when the exemption is finally denied and the member must choose to imme-diately receive the injection or immediately defy a direct order.  For that reason, "ripeness" can occur no later than the moment the member must irreparably receive the injection or irreparably defy an order.[6]

---

[6] An actual or imminent injury might arise before a plaintiff's request and appeal is conclu-sively denied if a plaintiff receives targeted punishment for requesting an exemption. *Singh v. Carter*, 168 F. Supp. 3d 216, 228–32 (D.D.C. 2016) (holding that the Army's subjecting the plaintiff to "spe-cialized helmet and gas mask testing," which "[was] not required of any other soldier," because of the plaintiff's religious exemption request constituted a substantial burden under RFRA).

## CONCLUSION

The plaintiffs move for a preliminary injunction that preserves the status quo until a final determination on the merits of their claims under 21 U.S.C. § 360bbb-3, the First Amendment, and RFRA.  For several reasons explained in this order, some of the plaintiffs, including the alleged "federal civilian employees," the "federal contractors," and the "employees of federal contractors" are unlikely, based on the current record, to prevail on the merits because they are unrepresented among the identified plaintiffs, have sued the wrong defendants, have a remedy in another court, or the like.

The motion on behalf of the service-member plaintiffs is not so easily resolved. A principal, but temporary, difficulty in assessing at this moment the likelihood of success on the RFRA claim arises primarily from two sources.  First, the plaintiffs claim the regulations — governing in each respective branch the availability of a religious exemption from the COVID vaccine and purporting to comply with the demands of RFRA — in reality disguise an unlawful and pervasive policy of the Secretary of Defense and each branch of the armed forces to deny individual consideration of each claim for a religious exemption, to instead "deny them all," and to punish, possibly by discharge, without exemption and without accommodation, those who assert a sincere religious objection and accordingly refuse the vaccine.

The data provided by the military are distinctly suggestive and certainly not inconsistent with the plaintiffs' assertions.  But the data are incomplete and offer no firm basis to project reliably either (1) the actual purpose and the actual application

of the regulations or (2) the number of service members who, after completion of the necessary steps, are denied an exemption and an accommodation and are subject to discipline, notwithstanding a sincere religious objection to receiving the vaccine.

Interestingly, the greater the number of exemptions and accommodations granted, the more adverse presumably the effect of the exemptions on the readiness and fitness of the force. But simultaneously the claim that the regulations are a ruse becomes proportionately less convincing as the exemptions increase. Conversely, the fewer the number of exemptions and accommodations granted, the less presumably the effect on the force and the more convincing the argument that the regulations are, shall we say, insincere and, in proportion, the less convincing is the argument that the military has a compelling reason not to grant the exemptions and accommodations.

But another and perhaps more precisely determinative factor appears and tends toward resolution as the data becomes more complete. To accomplish the consideration required by RFRA, the military certainly must consider, perhaps above all else, not whether COVID adversely affects the force (or course it does) but whether the readiness and fitness of the force is more adversely affected (1) by granting exemptions and accommodations to a stated number of sincere objectors or (2) by punishing, separating, and discharging that same stated number of skilled and experienced personnel, notwithstanding the time, energy, and money expended to train those service members and necessarily spent again to locate, recruit, and train a

successor, including the cost of the successors' acquiring similar experience and the deficit in fitness and readiness experienced in the interim.

Whether characterized as a facial challenge or as a class of precisely similar as-applied challenges, requiring only a single judicial determination, the plaintiffs' contention is — based on current data — quite plausible that each branch's procedure for requesting a religious exemption is a ruse that will result inevitably in the undifferentiated (and therefore unlawful under RFRA) denial of each service member's request.  Particularly, the data produced by the defendants show that more than 16,643 requests for a religious exemption pend.  The military has granted no exemptions but has denied hundreds.  This disparity, although susceptible to a benign explanation is, as well, susceptible to an explanation actionable and remediable under RFRA.  The importance of a person's right to religious liberty, protected in the Free Exercise Clause of the First Amendment to the Constitution and the explicit implementing commands of RFRA, commends deferring the resolution of the service members' motion for preliminary injunction pending the accumulation and reporting of additional data and the resumption — with the benefit of more complete and telling data — of the hearing on the motion for preliminary injunction.

Counsel for the defendants acknowledged at the hearing that each service branch retains a centralized and readily accessible record of the status of each exemption request in each branch of the military.  The defendants must file every **FOUR**

**TEEN DAYS**, beginning on January 7, 2022, a notice providing **SEPARATELY FOR EACH BRANCH OF THE ARMED FORCES**:

(1)  the aggregate number of religious-exemption requests from COVID-19 vaccination, the aggregate number of initial denials, the number of those denials in which the chaplain determined that the asserted belief is sincere, the aggregate number of appeals pending, the aggregate number of denials for which the time to appeal has expired without appeal, the number of appeals denied, the number of successful appeals (that is, the number of appeals that resolve or remand for resolution the application for an exemption), and the total number of religious exemptions finally granted and finally denied;

(2)  the number of medical-exemption requests from COVID-19 vaccination and the number of medical exemptions granted and denied;

(3)  the number of other exemptions from COVID-19 vaccination granted for any other reason; and

(4)  the number of courts-martial and the number of separation proceedings pending or concluded against a service member whose request for a religious exemption was denied after appeal.

The motion (Doc. 2) for a temporary restraining order is **DENIED**, the motion for a preliminary injunction (1) is **DENIED** both on Count I for all plaintiffs and on Counts II and III for the civilian plaintiffs and (2) is **DEFERRED** on Counts II and III for the service-member plaintiffs.  No sooner than January 7, 2022, a party by supplemental memorandum or other paper may explain the factual basis warranting

either issuance of a preliminary injunction or a denial of the motion.  A separate order will schedule a resumption of the hearing, if necessary.

ORDERED in Tampa, Florida, on November 22, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 35 -